## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **VICKI A. KLIMA**, individually, as heir at law, | ) | |
| and as administrator of the estate of | ) | |
| Donna Faye Davis, deceased, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 10-cv-1390-JAR-JPO |
| | ) | |
| **THE EVANGELICAL LUTHERAN** | ) | |
| **GOOD SAMARITAN SOCIETY**, d/b/a | ) | |
| Hutchinson Good Samaritan Village | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This case comes before the Court on plaintiff's Notice that Defendant's Demand for Arbitration is Moot, and Motion to Dismiss Defendant's Demand for Arbitration (Doc. 47).  The motion is fully briefed, and the Court is prepared to rule.  As discussed below, the Court grants Plaintiff's motion, and as a result, the Court refuses to compel arbitration.

### I.     Background

When defendant, The Evangelical Lutheran Good Samaritan Society, admitted Donna Faye Davis to stay at its nursing home facility, defendant gave plaintiff, Ms. Davis's daughter, an admission contract, which she filled out for her mother.  The admission contract contained an arbitration agreement, which stated that the parties must use the National Arbitration Forum ("NAF") Code of Procedure for any dispute arising from Ms. Davis's stay at defendant's facility.

After Ms. Davis's death, plaintiff filed a lawsuit in state court against defendant claiming that her mother's death resulted from defendant's negligence.  Defendant removed the case to federal court and, on December 13, 2010, moved to dismiss the case or in the alternative to

compel arbitration.  Plaintiff opposed the motion to compel, contending that she did not agree to arbitrate and that her purported signature on the arbitration agreement had been forged.  The Court set the matter for trial on July 29,2011, and later continued the trial to November 10, 2011, on the factual issue of whether plaintiff's signature on the arbitration agreement had been forged.

On October 13, 2011, plaintiff discovered that the NAF no longer accepted consumer disputes.  Plaintiff contacted defendant on that same day to inform defendant that the NAF was no longer available and that the parties would not be able to arbitrate their dispute.  Defendant disagreed, stating that the claim could still be arbitrated.  Plaintiff then filed her motion with the Court on October 17, 2011, arguing that the arbitration agreement is unenforceable because the parties cannot arbitrate their dispute with the NAF.

Defendant replied to plaintiff's motion on October 20, 2011, arguing that the Court could appoint a new arbitrator by applying § 5 of the Federal Arbitration Act.  Defendant's reply brief indicated that defendant had known for some time that the NAF was unavailable. Indeed, defendant attached two cases to its brief, cases in which The Evangelical Lutheran Good Samaritan Society had previously litigated the viability of arbitration agreements that named NAF as the arbitrator.  Yet despite its earlier litigation of the issue, defendant had never informed plaintiff of the NAF's unavailability.  And so plaintiff discovered the unavailability of the NAF on her own less than a month before trial.

While trial is set for later this week on the arbitration agreement's validity, trial over the forgery issue is unnecessary if the NAF's unavailability makes the arbitration agreement unenforceable.  So the Court, before trial on the forgery issue, must examine whether the arbitration agreement is still enforceable now that the NAF is no longer available to arbitrate the

parties' dispute.

## II.   Governing Law

While the interpretation of contracts—including arbitration agreements—is usually a matter of state law, the Federal Arbitration Act ("FAA") imposes certain rules beyond those normally found in state contract law.[1]   The FAA applies to written arbitration agreements in any contract "evidencing a transaction involving commerce."[2]   And here, the arbitration agreement between defendant and plaintiff contains a provision that specifically refers to the FAA: "This arbitration agreement shall be governed by and interpreted under the Federal Arbitration Act, 9 U.S.C. Section 1–16 (or as amended)."[3]   So the Court interprets this arbitration agreement under the FAA.

Congress designed the FAA "'to overrule the judiciary's long standing refusal to enforce agreements to arbitrate'"[4] and, by enacting the FAA, created "a liberal federal policy favoring arbitration agreements."[5]   But despite its liberal policy, the FAA does not "require parties to arbitrate when they have not agreed to do so."[6]   Instead, it requires that courts enforce "agreements to arbitrate, like other contracts, in accordance with their terms."[7]   So if a generally

---

[1]*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (citing *Arthur Anderson LLP v. Carlisle*, 129 S. Ct. 1896, 1901–02 (2009); *Perry v. Thomas*, 482 U.S. 483, 493 n.9 (1987); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).

[2]9 U.S.C. § 2.

[3]Doc. 47, Ex. 6.

[4]*Volt Info. Scis., Inc.*, 489 U.S. at 478 (quoting *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 219–20 (1985)).

[5]*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

[6]*Volt Info. Scis., Inc.*, 489 U.S. at 478.

[7]*Id.* (citing *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)).

applicable state contract defense invalidates an arbitration agreement or if grounds exist at law or equity that would call for the revocation of any contract, courts must not compel arbitration under the agreement.[8]  Enforcing the agreement according to its terms "is fully consistent with the goals of the FAA, even if the result is that the arbitration is stayed where the Act would otherwise permit it to go forward" because by rigorously enforcing the agreement according to its terms, courts give "effect to the contractual rights and expectations of the parties, without doing violence to the policies behind the FAA."[9]  Thus to determine the arbitration agreement's validity, the Court looks to both the FAA and generally applicable contract law.

## III.   Discussion

The arbitration agreement at issue in this case states that if the parties agree to arbitrate, any arbitration "shall be conducted  . . . in accordance with the National Arbitration Forum ("NAF") Code of Procedures for Arbitration" and that the party requesting arbitration "will be required to pay a filing fee to NAF."[10]  The NAF, however, no longer arbitrates consumer disputes.[11]  And so, plaintiff argues that the arbitration agreement is invalid because it is impossible to perform.  Defendant, however, points to the FAA and argues that the unavailability of the NAF does not invalidate the entire arbitration agreement because § 5 of the FAA authorizes a court to select a substitute arbitrator.

Section 5 of the FAA provides:

---

[8]*See id.*; *see also Perry v. Thomas*, 482 U.S. 483, 489 & 492–93 n.9 (1987).

[9]*Volt Info. Scis., Inc.*, 489 U.S. at 478.

[10]Doc. 47, Ex. 6.

[11]*See Rivera v. Am. Gen. Fin. Servs., Inc.*, 259 P.3d 803, 814 (N.M. 2011); *Carr v. Gateway*, 944 N.E.2d 327, 331 (Ill. 2011); *Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1163 (D.S.D. 2010).

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but . . . if for any other reason there shall be a lapse in the naming of an arbitrator . . . , then upon the application of either party to the controversy the court shall designate and appoint an arbitrator.[12]

By its plain language, § 5 allows courts to appoint an arbitrator in some circumstances. But courts disagree on the proper application of § 5 when the arbitration agreement names an arbitrator.[13] The Second Circuit in *In re Salomon Inc. Shareholders' Derivative Litigation*, for example, refused to apply § 5 of the FAA to replace a named, but unavailable, arbitrator, determining instead that § 5 only applies when the parties fail to name an arbitrator from the outset.[14] Other courts, including the Fifth,[15] Ninth,[16] and Eleventh[17] Circuits, use § 5 to appoint an arbitrator when the named arbitrator fails, explaining that unavailability of the named arbitrator creates a "lapse in the naming of an arbitrator" such that § 5 applies.[18]

But even courts using this more liberal application do not apply § 5 of the FAA to save an arbitration agreement in every case where an arbitrator becomes unavailable.[19] These courts

---

[12]9 U.S.C. § 5.

[13]*See Rivera*, 259 P.2d at 811–15 (collecting cases).

[14]68 F.3d 554, 560–61 (2d Cir. 1995).

[15]*Ranzy v. Tijerina*, 393 F. App'x 174, 175–76 (5th Cir. 2010).

[16]*Reddam v. KPMG LLP*, 457 F.3d 1054 (9th Cir. 2006), *abrogated on other grounds as recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 940 (9th Cir. 2010).

[17]*Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000).

[18]*See, e.g.*, *Rivera*, 259 P.2d at 812; *Carr v. Gateway, Inc.*, 944 N.E.2d 327, 336–37 (Ill. 2011); *Stewart v. GGNSC–Canonshurg, L.P.*, 9 A.3d 215, 221 (Pa. Super. Ct. 2010); *Grant v. Magnolia Manor–Greenwood , Inc.*, 678 S.E.2d 435, 438–39 (S.C. 2009); *McGuire, Cornwell & Blakey v. Grider*, 771 F. Supp. 319, 320 (D. Colo. 1991).

[19]*See, e.g.*, *Rivera*, 259 P.2d at 812; *Carr*, 944 N.E.2d at 336–37; *Stewart*, 9 A.3d at 221; *Grant*, 678 S.E.2d at 438–39.

instead hold that § 5 applies only if the selection of the specific arbitral forum is an ancillary logistical concern.[20]  If, on the other hand, the specified arbitrator is integral to the arbitration agreement, such that the parties would not have selected arbitration if the arbitral forum was unavailable, courts will not use § 5 to circumvent the parties' intent.[21]

While the Tenth Circuit has not addressed this issue, this Court finds the approach taken by the Fifth, Ninth, and Eleventh Circuits consistent with both the purpose behind the FAA and general principles of contract law because it treats arbitration agreements like contracts and looks to the parties' intent.  Thus, following that approach, the Court must determine whether the selection of the NAF is integral to the arbitration agreement.  If it is integral, the Court cannot appoint a new arbitrator and the entire arbitration agreement fails.

To determine whether selection of a specific arbitrator is integral to the entire agreement, courts refer to general principles of contract interpretation.[22]  The Supreme Court has stated that interpretation of arbitration agreements is generally a matter of state law, and "'as with any other contract, the parties' intentions control.'"[23]  Similarly, under Kansas law—where this contract was formed—the primary rule for interpreting contracts is to determine the parties' intent from the language of the written agreement.[24]  When interpreting the language of the agreement, "[a]n

---

[20]*See, e.g.*, *Reddam*, 457 F.3d at 1061; *Brown*, 211 F.3d at 1222; *Rivera*, 259 P.2d at 812.

[21]*See, e.g.*, *Reddam*, 457 F.3d at 1061; *Brown*, 211 F.3d at 1222; *Rivera*, 259 P.2d at 812.

[22]*See, e.g.*, *Ranzy v. Tijerina*, 393 F. App'x 174, 176 (5th Cir. 2010) (referring to rules of contract interpretation to determine whether the choice of the NAF was integral to the arbitration agreement); *Rivera*, 259 P.2d at 812 (referring to state contract law); *Carr*, 944 N.E.2d at 336–37 (referring to state contract law); *Stewart*, 9 A.3d at 221 (referring to state contract law).

[23]*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1773 (2010) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)).

[24]*Anderson v. Dillard's, Inc.*, 153 P.3d 550, 554 (Kan. 2007).

interpretation of a contractual provision should not be reached merely by isolating one particular sentence or provision, but by construing and considering the entire instrument from its four corners."[25]  If the terms of the written agreement are clear, courts need not look any further.[26]

Here, the terms of the arbitration agreement are clear, and the Court need not look outside the written agreement to ascertain the parties' intent.  Defendant's form arbitration agreement names the NAF specifically and exclusively throughout the agreement.  The agreement, for example, states: "Any arbitration . . . shall be conducted . . . in accordance with the National Arbitration Forum ("NAF") Code of Procedure for Arbitration."[27]  The agreement further states that "any person requesting arbitration will be required to pay a filing fee to NAF . . . ."[28]  The agreement also provides the NAF's full contact information for any party that would like more information on how the arbitration would be conducted: "If you would like information regarding NAF's arbitration services and its rules and procedures for arbitration, you may contact NAF . . . ."[29]  Finally, the agreement makes no provision for selecting any other arbitrator besides the NAF.  Taken together, these provisions show that the parties intended to select the NAF as the exclusive arbitrator.   Any other interpretation would be unreasonable—the Court cannot conclude that while a party must use the NAF rules and must pay the NAF a filing fee, it could then select a different arbitrator.  So while the agreement never explicitly states that the

[25]*Johnson Cnty Bank v. Ross*, 13 P.3d 351, 353 (Kan. Ct. App. 2000).

[26]*Anderson*, 153 P.3d at 554.

[27]Doc. 47, Ex. 6.

[28]*Id.*

[29]*Id.*

7

NAF is the exclusive arbitrator, by construing and considering the whole agreement and looking for a reasonable interpretation, the Court finds that the parties agreed that they would use no other arbitrator besides the NAF.

And while the Court need not go outside of the four corners of the arbitration agreement to make this determination, the rules designated in the agreement—and provided on the website listed within the agreement—further confirm that the parties intended to use the NAF exclusively.  The NAF Code of Procedure states that it is "incorporated by reference into every Arbitration Agreement" and that any arbitration using its rules and procedures "shall be administered only by [NAF] or by any entity or individual providing administrative services by agreement with the [NAF]."[30]  Neither party has indicated whether this language prevents an arbitrator outside of the NAF to conduct arbitration under the NAF rules or whether the entities and individuals providing service by agreement with NAF are also banned from arbitrating consumer disputes.  But the fact that the rules are restricted for use only by NAF or entities and individuals providing arbitral services by agreement with the NAF suggests that in explicitly selecting the NAF Code of Procedure, the parties exclusively selected the NAF to administer those procedures.[31]  Thus, the NAF Code of Procedure strengthens the Court's finding that the parties exclusively selected the NAF.

And not only did the parties exclusively select the NAF as their arbitrator, the language in the agreement further shows that the parties' selection of the NAF was integral to the agreement, such that the parties would not have agreed to arbitrate with another arbitrator.  In

---

[30]*Rivera v. Am. Gen. Fin. Servs.*, Inc., 259 P.3d 803, 814 (N.M. 2011).

[31]*See Carr v. Gateway, Inc.*, 944 N.E.2d 327, 336 (Ill. 2011).

several places, the agreement states that disputes "shall be settled exclusively by binding arbitration."[32]  Each time it makes this statement, the agreement adds, in the same sentence, that the arbitration will be conducted "as set forth in Section C. below."[33]  Section C of the agreement explains that the parties do not have to agree to arbitration, but once the parties agree on arbitration, the specific process of arbitration is mandatory: "If, however, the Resident agrees to arbitrate disputes by signing this Admission Agreement, then the arbitration will be conducted as follows . . . ."[34]  The agreement then goes on to explain the arbitration process as conducted by the NAF.  This language thus shows that if arbitration is to occur, it must proceed through the NAF.  The Court thus finds that the selection of the NAF is integral to the arbitration agreement and not merely an ancillary logistical concern.

Defendant, however, points to the language in the agreement and argues that because the agreement never explicitly states that the parties must arbitrate through the NAF, it does not select the NAF as an exclusive arbitrator, and even if it does, the selection of the NAF is not integral to the agreement.  Defendant cites to *Reddam v. KPMG LLP*[35] and *Brown v. ITT Consumer Fin. Corp.*,[36] which both found the selection of an arbitrator an ancillary concern because the parties merely selected the rules of the specific forum.  *Brown* and *Reddam* stand for the proposition that when an arbitration agreement  "merely selects the rules of a specific forum,

---

[32]Doc. 47, Ex. 6

[33]*Id.*

[34]*Id.*

[35]457 F.3d 1054 (9th Cir. 2006), *abrogated on other grounds as recognized by Atlantic Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931, 940 (9th Cir. 2010).

[36]211 F.3d 1217, 1222 (11th Cir. 2000).

as opposed to the forum itself, and another arbitral forum could apply those rules, the unavailability of the implicitly intended arbitral forum will not require the court to condemn the arbitration clause."[37]  Or put another way, these courts find that "[a]t a minimum for the selection of an arbitrator to be deemed 'integral,' the arbitration clause must include an 'express statement' designating a specific arbitrator."[38]  But in both *Reddam* and *Brown*, the Courts failed to find any other language besides the selection of the rules to indicate the parties selected a specific arbitrator.[39]  Unlike in *Reddam* and *Brown* the arbitration agreement here has additional language to suggest that the choice of the NAF was integral to the decision to arbitrate.  So this case is distinguishable from *Reddam* and *Brown* in that the parties did more than merely select the rules of the NAF; the agreement, read as a whole, shows that the parties selected the NAF as the exclusive arbitrator.

        Defendant also points the Court to the severance clause in the admissions contract to show that the Court need not invalidate the entire arbitration agreement.  While the arbitration agreement itself does not contain a severance clause, the arbitration agreement is part of the admissions contract, which contains a clause that states: "Any provision in this Agreement found to be invalid will be severable, and the remainder of this Agreement will remain effective."[40]  Defendant asks that the Court "sever any such references to the NAF and enforce the remainder

---

[37]*Stewart v. GGNSC–Canonsburg, L.P.*, 9 A.3d 215, 219 (Pa. Super. Ct. 2011) (citing *Reddam*, 457 F.3d at 1059–61)).

[38]*Id.* (citing *Reddam*, 457 F.3d at 1060; *Ranzy v. Tijerina*, 393 F. App'x 174 (5th Cir. 2010)).

[39]*See Reddam*, 457 F.3d at 1059–60 (explaining that the parties merely selected the forum's rules without noting any other language in the agreement); *Brown*, 211 F.3d at 1220 & 1222 (citing only to the language in the agreement selecting the NAF rules).

[40]Doc. 4, Ex. D, at 2.

of the arbitration agreement pursuant to the parties' intentions as evidenced by the severance

provision."[41]  Some courts have found that a severance clause shows that the choice of a specific

arbitrator is merely an ancillary concern.[42]  In *Jones v. GGNSC Pierre LLC*, for example, the

court found that the severance clause showed that selection of the specific arbitrator was not

integral to the arbitration agreement.[43]  But in *Jones*, the parties included the severance clause in

the arbitration agreement.[44]  Additionally, the court found other language within the arbitration

agreement that showed that the selection of the arbitrator was an ancillary concern.[45]  Unlike in

*Jones*, the parties here did not include the severance clause in the arbitration agreement and the

language within the arbitration agreement shows the important of the NAF as an arbitrator.

Thus, the severance clause here does not as strongly reflect the parties' intent.  As explained

above, the Court finds that the language in the arbitration agreement shows that the selection of

the NAF is integral to the agreement to arbitrate and the severance clause in the admission

contract does not change that determination.  Therefore, the Court will not go against the

demonstrated intent of the parties to arbitrate before the NAF and sever the references to the

NAF from the rest of the agreement.

Even if the Court followed defendant's suggestion to use the severance clause, the Court

is unsure of whether it could sever the references to the NAF without also severing the NAF

---

[41]Doc. 4, at 20.

[42]*See Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1167 (D.S.D. 2010); *Estate of Eckstein v. Life Care Centers of Am.*, 623 F. Supp. 2d 1235, 1238 (E.D. Wash. 2009).

[43]684 F. Supp. 2d at 1167 (citing *Estate of Eckstein*, 623 F. Supp. 2d 1235).

[44]*Id.*

[45]*Id.* at 1167–68.

Code of Procedure.  First, the NAF Code of Procedure may not even remain in effect for administering consumer disputes.[46]  Under its consent decree, the NAF cannot arbitrate any consumer disputes, and so there may not be any NAF procedures that remain effective for consumer disputes.[47]  Second, the NAF Code of Procedure states that only the NAF or an individual providing services for the NAF may administer the Code of Procedure.[48]  As discussed above, this provision in the NAF Code of Procedure may make it impossible for anyone else to use the rules.  In that case, either the parties would have to use another set of rules or they would have to alter the NAF Code of Procedures to accommodate a new arbitrator.  Either way, the parties would be proceeding under a new arbitrator and a new set of rules not contemplated by the arbitration agreement, requiring the Court to rewrite substantial portions of the contract.  These problems that would occur after severance of the NAF bolster the Court's determination that the selection of the NAF is integral to the arbitration agreement and cannot be severed from it.

## IV.   Conclusion

The exclusive references to the NAF, the selection of the NAF rules, the requirement to pay the NAF, the mandatory language of the contract, and the absence of any provision allowing for a substitute arbitrator all support the conclusion that the NAF is the exclusive arbitrator and that the selection of the NAF is integral to the parties agreement to arbitrate.  As such, the Court cannot use § 5 of the FAA to appoint a substitute arbitrator, and the entire arbitration agreement

---

[46]*Rivera v. Am. Gen. Fin. Servs.*, Inc., 259 P.3d 803, 814 (N.M. 2011) (citing *Carideo v. Dell, Inc.*, No. C06-1772JLR, 2009 WL 3485933, at *5 (W.D. Wash. Oct. 26, 2009)).

[47]*Carideo*, 2009 WL 3485933, at *5.

[48]*Rivera*, 259 P.3d at 814.

is unenforceable because the NAF no longer arbitrates consumer disputes.  The Court therefore will not compel arbitration.  Further, trial is no longer needed to determine whether the signature on the agreement was forged because even if plaintiff signed the agreement, the Court cannot enforce it.

**IT IS THEREFORE ORDERED BY THE COURT** that plaintiff's Notice that Defendant's Demand for Arbitration is Moot, and Motion to Dismiss Defendant's Demand for Arbitration (Doc. 47) is **GRANTED**.

**IT IS FURTHER ORDERED BY THE COURT** that the trial set for November 10, 2011, is canceled.

**IT IS SO ORDERED.**


Dated: <u>November 8, 2011</u>

                <u>S/ Julie A. Robinson</u>
                JULIE A. ROBINSON
                UNITED STATES DISTRICT JUDGE